X FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

APR 0 2 2026

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH APPLE ID 18211659191, JJOHNDDOE500@ICLOUD.COM THAT IS STORED AT PREMISES CONTROLLED BY APPLE, INC.** | Case No. _____ 1:26-mj-00555-ADC |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Bryan Fields, Special Agent, Drug Enforcement Administration ("DEA"), being first duly sworn, hereby depose and state the following:

**INTRODUCTION**

1. I make this affidavit in support of an application for a search warrant for information associated with Apple ID **18211659191, jjohnddoe500@icloud.com** (the "**TARGET ACCOUNT**") that is stored at premises owned, maintained, controlled, or operated by Apple Inc. ("Apple"), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**AGENT BACKGROUND**

2. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3.    I have been employed as a Special Agent ("SA") with Drug Enforcement Administration ("DEA") since October 2023. I started at the DEA Baltimore District Office ("BDO") HIDTA-TF. I attended DEA Basic Agent Training in 2023-24 at the DEA Training Academy in Quantico, Virginia. This 17-week training included classes on the investigation, detection, and identification of Controlled Substances Act violations. Prior to DEA, I was an employee with the Department of Defense ("DOD"), National Security Agency ("NSA"), working in Special Operations under the Cybersecurity directorate. Moreover, I serve as an intelligence officer in the United States Army Reserves within the 200th Military Police Command, where I directly work with the U.S. Army Criminal Investigation Division ("CID"). I have received extensive training, both formal and on-the-job, in the provisions of the Federal Narcotics Laws and Federal Firearm Laws administered under Title 18, Title 21, and Title 26 of the United States Code.

4.    As a DEA Special Agent, I have participated in investigations of drug trafficking during which I have used the following investigative techniques: (1) interviewing informants and cooperating witnesses; (2) conducting physical surveillance; (3) supporting undercover operations; (4) consensual monitoring and recording of both telephonic and non-telephonic communications; (5) analyzing telephone pen register and caller identification system data; (6) conducting court-authorized electronic surveillance; and (7) preparing and executing search warrants that have led to substantial seizures of narcotics, and other contraband.

5.    I have also received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, and the investigation of white-collar crimes and various other crimes.

6.    In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of proceeds derived from the sale of narcotics, and the organization of drug trafficking conspiracies.

7.    Specifically, based on my training and experience in investigating narcotics related crimes, I know the following:

  a.  Drug trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, narcotics trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity.

  b.  Drug traffickers commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell, and members of one cell commonly receive information only about that specific cell's criminal activities.  Consequently, this limitation of information frustrates law enforcement efforts to dismantle the entire organization.

  c.  Cellular telephones are an indispensable tool of the drug trafficking trade. Drug traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with co-conspirators.  In addition, drug traffickers will often change their cellular telephone numbers following the arrest of a member of their drug trafficking organization ("DTO"), or at random times in order to frustrate law enforcement efforts.

  d.  Individuals who engage in drug trafficking often use cellular telephones to communicate with co-conspirators via phone calls and text messages.

  e.  Drug traffickers often swap vehicles with other conspirators, use vehicles with dealer/interchangeable registration plates, use rental vehicles, use multiple vehicles, and use vehicles registered in names other than their own in order to thwart law enforcement efforts.

f. Drug traffickers use uninhabitable locations (for example, vacant dwellings, storage lockers, garages, etc.), often under another person's name, as "stash locations" for the storage of drugs and currency, as well as to process and package drugs for distribution. I know that houses and/or apartments within neighborhoods are often utilized as stash houses.

8. Because this affidavit is being submitted for the limited purpose of establishing probable cause to search for information associated with the **TARGET ACCOUNT**, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based on my personal knowledge, my review of documents and other evidence obtained in this investigation, information obtained from other agents and witnesses, and my own training and experience.

9. Based on the facts set forth in this affidavit, I submit there is probable cause to believe that the **TARGET ACCOUNT** contains evidence, fruits, and/or instrumentalities of violations of federal law, including conspiracy to distribute and possess with intent to distribute controlled substances (21 U.S.C. § 846) and distribution and possession with intent to distribute controlled substances (21 U.S.C. § 841(a)(1)) (collectively, the "**SUBJECT OFFENSES**").

## JURISDICTION

10. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

11.    As described in further detail below, an ongoing federal narcotics investigation established that Terrel **TOMLIN** operated a heroin, fentanyl, and cocaine base distribution organization through open-air "street shops" in northwest Baltimore, including locations along the 5200 block of Cordelia Avenue and later the 5300 block of Nelson Avenue. Through a combination of court-authorized GPS tracking, pen register and trap-and-trace orders, cellular location warrants, pole camera surveillance, controlled purchases, traffic stops, K-9 alerts, and confidential source information, investigators determined that **TOMLIN** acted as the supplier and leader of this organization, while Michael **MCKAY**, Michael **ATKINS**, Andre **GIBBS**, and others conducted street-level distribution on his behalf.

12.    The investigation into **TOMLIN** began when a confidential source of information ("CS-1")[1] identified **TOMLIN** as the leader of the Cordelia Avenue street shop and further identified other members of the **TOMLIN** DTO responsible for conducting daily sales and collecting proceeds, known by their street names: "Tank," "M&M" (**MCKAY**), "Ice" (**ATKINS**), and "Sean" (Sean **BEN**). CS-1 explained that **TOMLIN** personally supplies the shop each morning, uses trusted lieutenants in the DTO to manage it, and further maintains multiple stash locations, including **MCKAY**'s apartment located at 3932 West Northern Parkway, Apartment B1, Baltimore, Maryland (the "NORTHERN PARKWAY PREMISES").

---

[1] CS-1 is an individual known to law enforcement who provides intelligence based on personal knowledge or observation. CS-1 has been vetted through corroboration and, since July of 2025, has provided DEA accurate information in prior narcotics cases, and is familiar with Baltimore street-level drug operations, terminology, and personnel.

A combination of physical surveillance, toll analysis, and various forms of electronic monitoring have confirmed the information provided by CS-1 with a high degree of reliability.

13.    While the street shop was located in the 5200 block of Cordelia Avenue, investigators observed a consistent pattern of operation:  At some point prior to 6:00 a.m., **TOMLIN** would drive his car, a 2015 black Acura RLX bearing Maryland registration 1GM0844 and Vehicle Identification Number (VIN) JH4KC1F58FC001573 (the "Acura") from either his primary residence located at 9200 Owings Park Drive, Apartment F, Owings Mills, Maryland (the "OWINGS PARK PREMISES") or another residence located at 1543 Northgate Road, Baltimore, Maryland (the "NORTHGATE PREMISES") to the NORTHERN PARKWAY PREMISES, where he would pick up **MCKAY** and transport him to the area of the street shop. **MCKAY** would then walk to the street shop and, with other members of the **TOMLIN** DTO— including **ATKINS** and **BEN**—conduct sales of cocaine base ("crack"), fentanyl, heroin, and "scramble" (a mixture of fentanyl and heroin, usually combined with other substances). Although the street shop moved a short distance to a new location in early 2026, the **TOMLIN** DTO continued to distribute drugs in the area, following a similar pattern of activity.

14.    Beginning in late December 2025 and continuing through January 2026, investigators observed the DTO shift its street-level sales from Cordelia Avenue to the 5300 block of Nelson Avenue near Hayward Avenue, which is roughly two blocks away from the Cordelia location. At this new location, investigators identified **GIBBS**, who resides nearby at a residence on Nelson Avenue, conducting repeated hand-to-hand transactions with suspected associates and customers. Investigators also identified Keenan **JACKSON**, who was repeatedly observed engaging in suspected sales activity, specifically restarting street shop activity after short stoppages. Despite the minor geographic relocation, investigators observed that the **TOMLIN**

DTO continued to operate the street shop following the same general pattern of activity, distributing the same narcotics, and drawing users from Baltimore City, Carroll County, and Pennsylvania.

15. Over the course of the investigation, federal and state judges issued multiple court orders authorizing the collection of cellular toll records, pen register data, real-time location information for **TOMLIN**'s phones, and GPS tracking for vehicles used by **TOMLIN**. Those investigative techniques consistently demonstrated that **TOMLIN** coordinated daily supply runs, communicated with his lieutenants in the early morning hours prior to shop openings, and traveled between stash locations and active distribution areas.

16. Additionally, between November 2025 and January 2026, **TOMLIN** changed cell phones multiple times, usually switching to a new phone number every few weeks. Investigators identified each new number as **TOMLIN** changed phones based on call logs, location information from the phones obtained pursuant to "ping" warrants, and surveillance.

17. **TOMLIN, MCKAY, JACKSON**, and other co-conspirators were ultimately charged by criminal complaint (Case Nos. 26-MJ-107 *et seq.*) and subsequently by indictment in the District of Maryland (Crim. Case No. JKB-26-51).

18. On or about January 21, 2026, **TOMLIN** was arrested pursuant to a federal warrant issued in tandem with the criminal complaint. Investigators seized a phone from his person at that time.

19. Following **TOMLIN**'s arrest, investigators conducted continued physical surveillance of the former street shop locations, including the 5200 block of Cordelia Avenue and the 5300 block of Nelson Avenue. Prior to the arrests, these locations exhibited consistent indicators of open-air narcotics distribution, including short-term vehicle traffic, dealer positioning

near detached garages and alleyways, and confirmed user purchases corroborated by traffic stops. Since **TOMLIN**'s arrest, investigators have observed a sustained and significant absence of that activity. There has been no consistent dealer positioning, no observable user traffic traveling to those areas to procure narcotics, and no conduct consistent with an operating street shop. Based on my training, knowledge, and experience, the immediate cessation of activity following **TOMLIN**'s arrest further corroborates that **TOMLIN** exercised operational control over the distribution network and that the organization relied upon centralized coordination and communication directed by him.

20.    On February 19, 2026, in response to an administrative subpoena, investigators received subscriber records from Apple identifying an iCloud account associated with **TOMLIN**: the **TARGET ACCOUNT**. Those records further showed that the **TARGET ACCOUNT** was linked to a cellular telephone assigned call number (443) 414-2155, which was one of the phones used by **TOMLIN** during the investigation. Apple further advised that the **TARGET ACCOUNT** was the only Apple ID associated with **TOMLIN**'s identifying information. The subscriber records tied the **TARGET ACCOUNT** to an address previously used by **TOMLIN** and associated with his registered vehicle and prior criminal history, further confirming his control of the **TARGET ACCOUNT**. Also, on February 19, 2026, in response to a grand jury subpoena, Block Inc. returned records related to **TOMLIN**'s CashApp account, which is also linked to the same email used for the **TARGET ACCOUNT**.

21.    Based on my training and experience, individuals engaged in narcotics trafficking routinely use cloud-based accounts such as iCloud to store and preserve communications, contact lists, photographs, financial information, notes, and application data, including backups of encrypted messaging platforms such as iMessage and WhatsApp. Even when devices are changed,

discarded, or seized, historical communications and media are often retained within associated cloud accounts, such as the **TARGET ACCOUNT**. Narcotics traffickers commonly use these platforms to coordinate supply runs, direct street-level workers, discuss pricing and quantities, exchange photographs of narcotics or proceeds, share stash locations, and communicate with co-conspirators regarding enforcement risks and contingency plans.

22.     Because **TOMLIN** used multiple cellular telephones during the course of the investigation, and because the phone number currently associated with the **TARGET ACCOUNT** was tied through judicial process to his coordination of the conspiracy, I believe that the **TARGET ACCOUNT** likely contains evidence related to the drug trafficking conspiracy, including historical communications with **MCKAY**, **ATKINS**, **GIBBS**, **JACKSON**, and other co-conspirators. Such communications may include instructions regarding the operation of the Cordelia and Nelson Avenue street shops, supply coordination, discussions of stash locations, proceeds collection, and responses to law enforcement activity. Since **TOMLIN** switched phones so frequently, I also believe that this information is likely not available from the phone that was seized from his person when he was arrested.

## INFORMATION REGARDING APPLE ID AND iCLOUD[2]

23.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

---

[2] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back

24.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a.    Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.    iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.    iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote,

---

up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e. Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share their location with other iOS users. It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

f. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

25. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The

11

Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

26.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

27.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

28.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

29.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Some of this data is stored on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple. Records and data associated

13

with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

30.    In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

31.    For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

32.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

14

33. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the **SUBJECT OFFENSES**. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

34. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the **SUBJECT OFFENSES** or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the **SUBJECT OFFENSES**.

35. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the **SUBJECT OFFENSES**, including information that can be used to identify the account's user or users.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

36. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. § 2703(a), (b)(1)(A), and (c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data), particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

37.     Based on the above, I submit that probable cause exists to believe that the **TARGET ACCOUNTS** contains evidence, fruits, and/or instrumentalities of the **SUBJECT OFFENSES**, and that a search of the contents of this account will aid in identifying additional co-conspirators, potential stash locations, and corroborating prior activity involving **TOMLIN** and his DTO related to the **SUBJECT OFFENSES**.

38.     Wherefore, I request that the Court issue the proposed search warrant for Apple ID Apple ID **18211659191, jjohnddoe500@icloud.com**.

39.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

BRYAN FIELDS   Digitally signed by BRYAN FIELDS
Date: 2026.03.05 09:29:15
-05'00'

Bryan Fields
Special Agent, DEA

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) this __5__ day of March, 2026.

The Honorable A. David Copperthite
United States Magistrate Judge



16

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with Apple ID 18211659191, jjohnddoe500@icloud.com that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at 1 Infinite Loop, Cupertino, CA 95014.

**ATTACHMENT B**
**Particular Things to be Seized**

## I.   Information to be disclosed by Apple

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.   All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.   All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers

("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.      The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.      All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store

ii

and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.      All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.      All records pertaining to the types of service used;

i.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

**II.      Information to be seized by the government**

All information described above in Section I that constitutes contraband, fruits, evidence and/or instrumentalities of violations of the following federal laws: The items to be seized are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances) and 21 U.S.C. § 841(a) (Distribution and Possession with Intent to Distribute Controlled Substances) (collectively, the "**SUBJECT OFFENSES**"), involving Terrell Tomlin, Michael McKay, Michael Atkins, Andre Gibbs, Keenan

iii

Jackson, Sean Ben, and any other co-conspirators from November 1, 2025 through January 21, 2026, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.      All communications, including emails, iMessages, SMS, and any other messaging platforms, sent or received by the account that reference or relate to the **SUBJECT OFFENSES**, including but not limited to the recruitment of drug and money mules, movement of illicit funds, and instructions for wiring or transferring funds.

b.      All records of financial transactions, including but not limited to credit card statements, bank account numbers, payment methods, and transaction records for wire transfers, cryptocurrency transfers, or other digital payment methods used in furtherance of the **SUBJECT OFFENSES**.

c.      All contact lists, including phone numbers, email addresses, and usernames, associated with individuals or entities involved in or suspected of involvement in the **SUBJECT OFFENSES**.

d.      Any documents or files stored within the account that are related to the **SUBJECT OFFENSES**, including but not limited to any spreadsheets, records, or ledgers related to the sale of controlled substances, payments for controlled substances, and/or the disposition of proceeds from the sale of controlled substances.

e.      All records of communication with banks, financial institutions, cryptocurrency exchanges, or payment services, including emails, customer service inquiries, account registrations, and records of opening or managing bank accounts, digital wallets, or similar.

f.      Any records of the user's location and device activity that could help establish the whereabouts of the subject at critical times related to the **SUBJECT OFFENSES**.

iv

g.      Any records of physical goods or documents sent or received, including tracking numbers, receipts, shipping labels, or correspondences related to the use of the U.S. Postal Service or other delivery services in furtherance of the **SUBJECT OFFENSES**.

h.      Any photographs or videos stored on the account that are related to the **SUBJECT OFFENSES**.

i.      All records relating to the ownership, control, and use of the account, including login history, IP addresses used to access the account, device information, and any other relevant metadata that can link the account holder to the **SUBJECT OFFENSES**.

j.      All records of other accounts or devices linked to the Apple account, including backup devices, connected social media accounts, and any applications used for communication, financial transactions, or document storage that may reveal further evidence of the **SUBJECT OFFENSES**.

k.      Any stored digital records or communications that show planning or coordination between the user and co-conspirators, including discussions relating to the distribution of controlled substances, or other instrumentalities of the **SUBJECT OFFENSES**.

l.      Records of any online activity, including browsing history, search history, and internet bookmarks, that may show searches related to the **SUBJECT OFFENSES**.

m.      Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

n.      All data from third-party applications linked to the account (*e.g.*, Venmo, PayPal, Cash App, cryptocurrency apps, Telegram, WhatsApp) that were used to send or receive funds or communicate in furtherance of the **SUBJECT OFFENSES**.

v